**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KPA Promotions & Awards, Inc. and Above & Beyond Preschool, LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>JPMORGAN CHASE & CO. and JPMORGAN CHASE BANK, N.A.,<br><br>        Defendants. | Case No. 1:20-cv-3910<br><br>**<u>CLASS ACTION COMPLAINT FOR</u>:**<br><br><u>DEMAND FOR JURY TRIAL</u><br><br>1) New York General Business §349;<br>2) New York General Business §350;<br>3) Florida Deceptive and Unfair Trade Practices Act, Florida Statute §501.201, *et seq*.;<br>4) Fraudulent Concealment;<br>5) Breach of Fiduciary Duty; and<br>6) Negligence |

**NATURE OF THE ACTION**

1. Plaintiffs KPA Promotions & Awards, Inc. ("Plaintiff KPA") and Above & Beyond Preschool, LLC ("Plaintiff Above & Beyond," collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through its undersigned attorneys, bring this Class Action Complaint and jury demand against Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("Defendants"), for their unlawful acts and/or intentional practices of making false, misleading, and deceptive representations and omissions concerning their processing of economic assistance via the Federal Paycheck Protection Program ("PPP"), by engaging in conduct prohibited by law and regulations with customers and clients, and by otherwise engaging in improper business practices.

2. The U.S. Small Business Administration ("SBA") Paycheck Protection Program is "a loan designed to provide a direct incentive for small businesses to keep their workers on the

payroll." The loans are guaranteed by the federal government and are to be processed by banks on a "first-come, first-served" basis.[1]

3.     In violation of these rules, various state laws, and their fiduciary duties, Defendants made false, misleading, and deceptive material statements and omissions to consumers and small business owners who were in need of financial relief and assistance as a result of the COVID-19 pandemic.

4.     Specifically, Defendants knew that all loans through the PPP were vital to Plaintiffs and the Class members and critically time-sensitive given that the total amount of PPP funds were limited and the amount Defendants could loan pursuant to the PPP was capped. Defendants, as an approved lender, agreed to comply with all applicable rules, requirements and guidelines.[2]

5.     However, Defendants intentionally ignored the equitable and critical guideline that loans would be processed on a "first come, first served" basis as required by the PPP.  Rather, in order to maximize their financial gains, Defendants prioritized the processing of larger loans over smaller loans, thereby ensuring their receipt of greater origination fees, which were based on the loan amounts.  For instance, Defendants prioritized processing the loans for large restaurant chains such as Ruth's Chris Steakhouse (approved $20 million on April 7), Shake Shack ($10 million), Potbelly Sandwich Shop (approved $10 million on April 6), and Texas Taco Cabana (approved $10 million on April 8).[3]

---

[1] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program#section-header-2 (last accessed May 18, 2020) and SMALL BUSINESS ADMINISTRATION Interim Final Rule §m [Docket No. SBA-2020-0015] 13 CFR Part 120 Business Loan Program Temporary Changes; Paycheck Protection Program RIN 3245-AH34.

[2] https://www.sba.gov/sites/default/files/2020-04/PPP--Agreement-for-New-Lenders-Banks-Credit-Unions-FCS-w-seal-fillable.pdf  (last accessed May 18, 2020).

[3] Since receiving the $10 million and $20 million loans, respectively, Shake Shack and Ruth's Chris Steakhouse have announced they will return the entire amount of the loans.

6.      Indeed, news reports have revealed that banks provided preferential "concierge" treatment for their wealthiest clients, including a two-tiered system that provided fast-track procedures for the bank's most valuable customers that allowed such customers to avoid the cumbersome and buggy online portals which the ordinary "mom and pop" small businesses were required to use in order to apply for PPP loans.[4]

7.      For every loan completed, Defendants received between 1% and 5% of the loan amount in fees, depending on the amount of the loan: 5% on loans for less than $350,000; 3% for loans between $350,000 and $2,000,000; and 1% for loans for more than $2,000,000.  In total, Defendants and other banks received approximately $10 billion in fees to date.

8.      Defendants not only decided to line their own pockets at the expense of Plaintiffs and the Class members, they affirmatively chose to not disclose to any small business owners that they were prioritizing the larger loans and not following the PPP's official guidelines of processing loans on a "first come, first served" basis.  This was further wrongdoing as Plaintiffs and the Class members could have decided to apply for PPP assistance through another financial institution. Defendants' material misrepresentations and omissions ensured that there was no arms-length transaction between Plaintiffs and the Class Members and otherwise violated the SBA's regulatory code of ethics.

9.      Moreover, no reasonable consumer would have expected Defendants to prioritize the larger businesses in contradiction to the PPP guidelines and rules.

---

(https://www.businessinsider.com/ruths-chris-potbelly-chains-tk-million-in-small-business-loans-2020-4) (last accessed May 18, 2020).

[4]  https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html  (last  accessed April 28, 2020).

10.     Plaintiffs and the Class members have suffered enormous and irreparable damages. The delay in their receipt of the much-needed federal funds caused by Defendants' misrepresentations, omissions, and wrongdoing has prevented applicants for the PPP loans, such as Plaintiffs, from receiving the economic assistance they so desperately sought.

### JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over all causes of action under the Class Action Fairness Act of 2005 and 28 U.S.C. §1332, pursuant to which this Court has diversity jurisdiction because Plaintiffs and the Class members are citizens of states different than Defendants and because the amount in controversy exceeds the sum or value of $5,000,000.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendant JPMorgan Chase & Co.'s headquarters are located in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

### PARTIES

13.     Plaintiff KPA is, and at all times relevant hereto has been, an S-Corporation with its principal place of business in West Palm Beach, Florida.  Founded in 2008, Plaintiff KPA offers promotional products, recognition items, awards, medals, and plaques, and works with local companies, non-profits, school clubs, and PTOs to establish and manage individually logoed products.

14.     Plaintiff Above & Beyond is, and at all times relevant hereto has been, a limited liability company with its principal place of business in Royal Palm Beach, Florida.  Founded in 2018, Plaintiff Above & Beyond is a preschool that offers programs for children from six weeks of age through fifth grade.

15.     Defendant JPMorgan Chase Bank, N.A. ("Defendant Chase Bank") is headquartered in Columbus, Ohio.  Defendant Chase Bank conducts substantial business in New York by maintaining physical locations within this District, serving customers, including small business owners, within this District, and marketing and advertising its services within this District.  Defendant Chase Bank is a wholly-owned subsidiary of JPMorgan Chase & Co.

16.     Defendant JPMorgan Chase & Co. ("Defendant Chase") is headquartered in New York, New York.  It is a multinational financial services institution that provides investment, commercial, and private banking; asset management; and credit card services.

## FACTUAL ALLEGATIONS

17.     As a result of the rapidly increasing number of cases and countries affected by COVID-19, on March 11, 2020, the World Health Organization's ("WHO") Director-General declared COVID-19 as a pandemic.

18.     In response to the rapid spread of COVID-19 throughout Florida, on April 3, 2020, Florida's Governor Ron DeSantis issued Executive Order 20-91 ("Stay at Home Order"), which ordered Florida residents to stay at home.

19.     The Stay at Home Order allowed certain "essential services" to remain open, including banks, gas stations, pharmacies, grocery stores, and state and local government functions.

20.     However, the Stay at Home Order closed dine-in restaurants, entertainment venues, public events and gatherings, and hair and nail salons.

21.     On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law, including the provision of $349 billion in economic assistance to small businesses.

22.    The CARES Act created certain economic programs designed to provide financial assistance to small business owners, including $349 billion to the SBA to make "forgivable" loans available through the PPP to qualifying small businesses, non-profit organizations, and independent contractors.

23.    The PPP was intended to provide direct economic assistance to small businesses on a first-come, first-served basis and to preserve U.S. jobs.

24.    As an approved SBA lender, Defendants are required to "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Program Requirements," including any SBA rules or guidance, pursuant to the SBA Lender Agreement they signed.[5]  Such "rules or guidance" includes processing applications for PPP loans on a *first-come, first-served* basis.

25.    Moreover, all SBA lenders, including Defendants, "must act ethically" and may not, among other things, (i) self-deal; (ii) have a real or apparent conflict of interest with a borrower; (iii) knowingly misrepresent or make a false statement to the SBA; (iv) engage in conduct reflecting a lack of business integrity or honesty; or (v) engage in any activity which taints the bank's objective judgment in evaluating the loan.  *See* 13 CFR Part 120.140.  Defendants breached these duties, as well as Florida law, and their fiduciary obligations.

26.    The PPP was designed to help small business owners cover the costs associated with retaining their employees during the COVID-19 pandemic by providing 100% federally guaranteed loans.  Additionally, the loans may be forgiven, they carry no SBA fees, and loan repayment can be deferred for six months.

---

[5] https://www.sba.gov/sites/default/files/2020-04/PPP--Agreement-for-New-Lenders-Banks-Credit-Unions-FCS-w-seal-fillable.pdf (last accessed May 18, 2020).

27.     Small businesses are eligible to apply for a loan through the PPP if they have been harmed by the COVID-19 pandemic between February 15, 2020 and June 30, 2020.  Loans are retroactive to February 15, 2020, in order to provide assistance to workers who were already laid off.

28.     While the loans were guaranteed by the federal government, small business owners need to apply for such loans through private banks.

29.     Because each loan will be registered under a Taxpayer Identification Number, small business owners could only apply once for a loan through the PPP so if a bank was unwilling or did not treat each business on a first come, first served basis, an applicant was left with little recourse.

30.     According to the U.S. Small Business Administration Office of Advocacy, in 2018, the country had 30.2 million small businesses, representing 99.9% of all U.S. businesses and 47.5% of all employees in the U.S.[6]

31.     Of the 30.2 million small businesses in the U.S., 22 million are individually operated, with no employees other than the owner.[7]

32.     In 2018, the average loan amount backed by the SBA was $107,000.[8]

33.     Beginning on April 3, 2020, small businesses and sole proprietorships could apply for and receive loans through the PPP.  Beginning on April 10, 2020, independent contractors and

---

[6] https://www.sba.gov/sites/default/files/advocacy/2018-Small-Business-Profiles-US.pdf (last accessed May 18, 2020)

[7] https://www.chamberofcommerce.org/small-business-statistics/ (last accessed May 18, 2020)

[8] https://www.valuepenguin.com/average-small-business-loan-amount (last accessed May 18, 2020)

self-employed individuals could apply for and receive such loans.[9]  The last day to apply for and receive a loan through the PPP is June 30, 2020.

34.    Loans through the PPP were time-sensitive as they were to be administered on a "first-come, first-served" basis.  Consequently, loans should have been considered by banks in the order in which they were received, rendering the loan amount insignificant.[10]

35.    Additionally, PPP Lenders may not show favoritism with regard to processing time or prioritization of PPP applications for the lender's directors or shareholders.[11]

36.    Lenders of PPP loans earned varying percentages of origination fees, based on the loan amount: five percent on loans not more than $350,000; three percent on loans more than $350,000 but less than $2,000,000; and one percent on loans more than $2,000,000.[12]

37.    Despite the first come, first served mandate and because of the tiered percentage-based origination fees, lenders were financially incentivized to approve of larger loans ahead of smaller ones: one percent fees on a $5,000,000 loan would earn a bank $50,000 while five percent on a $350,000 loan would earn $17,500.

---

[9] The PPP's first round of funding ran out in a mere 13 days and the second round of PPP funding became available on April 27, 2020.

[10] SMALL BUSINESS ADMINISTRATION Interim Final Rule §m [Docket No. SBA-2020-0015] 13 CFR Part 120; Business Loan Program Temporary Changes; Paycheck Protection Program RIN 3245-AH34.

[11] Small Business Administration Interim Final Rule [Docket No. SBA-2020] 13 CFR Part 120; Business Loan Program Temporary Changes; Paycheck Protection Program- Additional Eligibility Criteria and Requirements for Certain Pledges of Loans.

[12] https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed May 18, 2020)

38.     The SBA tracked the numbers of approved loans and dollars for both the first 10 days of the PPP (April 3-13, first chart) and through the last 3 days (through April 16, second chart).[13]

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

- Overall average loan size is $239,152.

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791,761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

- Overall average loan size is $206K.

39.     Not only was the overall average loan size greater during the first 10 days of the PPP (see charts above: $239,152 vs. $206,000), but the number of approved loans for applications under $350,000 was significantly greater in the last three days before PPP funds ran out when compared to the first 10 days: 881,648 approved loans in the first 10 days versus 1,453,954 approved loans as of the last day PPP funds were available.  In the period between April 14 through

---

[13] https://www.sba.gov/sites/default/files/2020-04/PPP%20Report%20SBA%204.14.20%20%20-%20Read-Only.pdf and https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf (last accessed May 18, 2020)

April 16, 572,306 more loans were approved, representing a 65% increase over those approved during the first 10 days.

40.     That 65% increase is even more telling when compared with the difference in approved loans for applications above $2,000,000 for the same period. In the first 10 days, 19,789 loans were approved versus 25,978 loans approved as of the last day PPP funds were available, meaning that between April 14 through April 16, 6,189 loans were approved, equaling a 31% increase over those approved during the first 10 days.

41.     While almost all of Defendants' 8,500 commercial and private banking clients who applied received a loan through the PPP, only 18,000 of the more than 300,000 small business banking customers received one.[14]

42.     Before clients were able to apply for funds through the PPP, the Defendants provided very different sets of directions to their employees, which was based on the customer's status as either a small business banking customer or a private or commercial banking customer. The small business banking customers first faced sporadic access to an online portal where they could submit preliminary requests to apply for loans, and could then only wait for a call from one of Defendants' representatives for help.  If these customers asked about the status of their loan applications, employees were directed to not become involved in the application process, but to merely tell them their applications were in a queue and would be processed as quickly as possible. In contrast, private or commercial banking customers were assigned an employee who was to

---

[14] https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html (last accessed April 28, 2020).

provide them with "concierge treatment," meaning they would never be queued up or have to wait for access to an online portal.[15]

43.    It's clear that lenders such as Defendants did not process loans on a "first come, first served" basis as required by the PPP, but that the loan amount and possible loan failure exposure to the Defendants influenced when the application was processed and submitted for approval.

44.    For example, Defendants quickly approved four loans equaling $50 million in loans to large restaurant chains Ruth's Chris Steakhouse (approved $20 million on April 7), Shake Shack ($10 million), Potbelly Sandwich Shop (approved $10 million on April 6), and Texas Taco Cabana (approved $10 million on April 8).[16]

45.    Defendants provided PPP loan funding without requiring customers to sign any paperwork.  Additionally, Defendants backdated the deposited funds and used the backdate to determine the deadline by which the small business banking customers needed to use the funds.

**Plaintiff KPA:**

46.    Plaintiff KPA learned of the CARES Act and PPP when it was passed and signed into law by President Trump.

47.    As a result of the COVID-19 pandemic and the Stay at Home Order, Plaintiff KPA was forced to lay off and furlough its employees.

---

[15] *Id.*

[16] Since receiving their multi-million dollar loans, Shake Shack and Ruth's Chris Steakhouse have announced they will return the entire amount of the loan. However, such decisions won't change the fact that Plaintiffs and the Class members have thus far been denied access to PPP's loans. https://www.cnn.com/2020/04/24/business/ruth-chris-jpmorgan-small-business-ppp/index.html (last accessed April 28, 2020).

48.     On approximately March 30, 2020, Plaintiff KPA submitted an online questionnaire where it indicated its interest in receiving a loan through the PPP with Defendants.

49.     On approximately April 5, 2020, Plaintiff KPA received an email communication from Defendants stating that it would receive further information regarding a loan application via a subsequent email communication or by phone.  However, Plaintiff KPA did not receive a follow up e-mail communication nor a phone call from Defendants.

50.     On approximately April 7, 2020, after an independent and persistent investigation into its funding options through Defendants, Plaintiff KPA submitted an application for a loan through the PPP with Defendants.  Plaintiff KPA applied for a loan through the PPP in order to keep employees on the payroll, as well as to pay rent and health insurance expenses.  Plaintiff KPA chose to submit a loan application with Defendants because it is  Plaintiff KPA's regular business bank.

51.     On that same day, Plaintiff KPA received an e-mail communication from Defendants acknowledging receipt of its loan application.

52.     On April 17, 2020, Plaintiff KPA received an e-mail communication stating that PPP funds were no longer available.  On April 22, 2020, Plaintiff KPA received two e-mail communications from Defendants notifying it that its application had reached Stage 3 in the approval process and was awaiting SBA approval and informing it that once the second round of PPP funding is approved, Defendants would submit applications from their queue, beginning with those applicants in Stage 3 of the approval process.

53.     On April 29, 2020, Plaintiff KPA received an e-mail communication from Defendants stating that its loan application was sent to the SBA for processing.

54.     On April 30, 2020, Plaintiff KPA received an e-mail communication from Defendants notifying it that the SBA approved its loan application.  On that same day, Defendants deposited loan funds into Plaintiff KPA's account.   Plaintiff KPA did not sign an approval form or any loan agreement prior to Defendants depositing the funds into its account.

55.     Plaintiff KPA was only required to sign a verification that the information submitted with its loan application was true.  It was not required to sign any paperwork in order to receive the loan funds.

56.     While the funds were deposited into Plaintiff KPA's account on April 30, 2020, Defendants backdated the deposited funds to April 7, 2020.

57.     Defendants have used the backdate of April 7, 2020, to determine the deadline by which Plaintiff KPA must use the PPP funds.  Accordingly, Defendants have cut the amount of time by which Plaintiff KPA may use the funds by 23 days.  In addition, without consulting with Plaintiff KPA, Defendants set up automatic repayment of the PPP loan to be paid from Plaintiff KPA's account, beginning on June 7, 2020, and did not provide Plaintiff KPA with the option to request a deferment of the loan repayment.

58.     Because of the backdated deposit of loan funds, the harm Defendants have caused Plaintiff KPA is ongoing as the very survival of its business continues to be threatened.  Because of the backdated deposit and shortened time period during which Defendants have required Plaintiff KPA use the loan funds, it is unsure how to proceed without violating any PPP or SBA regulations or requirements that would allow for its loan to be forgiven.

59.     Defendants claim they worked tirelessly to ensure as many clients received PPP funds as possible, and that loan applications were processed and approved "in the same general order" in which they received the initial online form.[17]

60.     However, Defendants misled and deceived their clients, including Plaintiff KPA, into believing applications for loans through the PPP were processed in the order received with no regard to loan amount, when in fact the loan amount certainly influenced the order in which loans were processed and approved.

61.     If Defendants had not misled and deceived Plaintiff KPA, Plaintiff KPA could have submitted their applications for loans through the PPP with other lenders that were following the required "first come, first served" application processing order.  Because small businesses, including Plaintiff KPA, were only allowed to submit one application for PPP loans, they could not go to another lender for assistance.

62.     Defendants knew their clients, including Plaintiff KPA, trusted them and believed they would administer the PPP as required, but chose to exploit their clients' trust.  As a result of Defendants' greed and focus on their own financial incentives, countless small businesses were prevented from benefitting from the program designed to help them survive during the COVID-19 pandemic.

63.     Plaintiff KPA, like other reasonable small business owners, saw and reasonably relied upon Defendants' false, misleading, and deceptive misrepresentations and omissions alleged herein, when making its decision to apply for loan assistance through the PPP.

---

[17] https://recovery.chase.com/cares1 (last accessed April 22, 2020)

64.     Plaintiff KPA was unaware that Defendants were disseminating misleading and deceptive misrepresentations and omissions regarding its administration and handling of the loan assistance through the PPP.

**Plaintiff Above & Beyond:**

65.     Plaintiff Above & Beyond learned of the CARES Act and PPP when it was passed and signed into law by President Trump.

66.     As a result of the COVID-19 pandemic and the Stay at Home Order, Plaintiff Above & Beyond has lost 65% of its clients and more than $20,000 in revenue per month.

67.     On April 5, 2020, Plaintiff Above & Beyond submitted a PPP inquiry with Defendants.  That same day, it received an e-mail communication from Defendants stating that it would receive a subsequent e-mail communication that would either direct it online to complete the loan application or a call to complete the application over the phone.

68.     Plaintiff Above & Beyond submitted an online application for a loan through the PPP with Defendants.  Plaintiff Above & Beyond applied for a loan through the PPP in order to keep employees on the payroll, as well as to pay rent and other approved expenses.  Plaintiff Above & Beyond chose to submit a loan application with Defendants because they are Plaintiff Above & Beyond's regular business bank.

69.     Plaintiff Above & Beyond's application for a loan through the PPP was initially denied by Defendants.  Subsequently, Plaintiff Above & Beyond submitted a loan application a second time.

70.     On approximately May 7, 2020, Plaintiff Above & Beyond received an e-mail communication from Defendants stating that its application for a PPP loan was again not approved.

71.     Because Plaintiff Above & Beyond submitted an application for a loan through the PPP with Defendants, it was denied access to funds that would have helped it survive the Stay at Home Order and resulting business closure and economic crisis and was prevented from seeking assistance from a different lender.

72.     Defendants claim they worked tirelessly to ensure as many clients received PPP funds as possible, and that loan applications were processed and approved "in the same general order" in which they received the initial online form.[18]

73.     However, Defendants misled and deceived their clients, including Plaintiff Above & Beyond, into believing applications for loans through the PPP were processed in the order received with no regard to loan amount, when in fact the loan amount certainly influenced the order in which loans were processed and approved.

74.     If Defendants had not misled and deceived Plaintiff Above & Beyond, Plaintiff Above & Beyond could have submitted their applications for loans through the PPP with other lenders that were following the required "first come, first served" application processing order. Because small businesses, including Plaintiff Above & Beyond, were only allowed to submit one application for PPP loans, they could not go to another lender for assistance.

75.     Defendants knew their clients, including Plaintiff Above & Beyond, trusted them and believed they would administer the PPP as required, but chose to exploit their clients' trust. As a result of Defendants' greed and focus on their own financial incentives, countless small businesses were prevented from benefitting from the program designed to help them survive during the COVID-19 pandemic.

---

[18] https://recovery.chase.com/cares1 (last accessed April 22, 2020)

76.     Plaintiff Above & Beyond, like other reasonable small business owners, saw and reasonably relied upon Defendants' false, misleading, and deceptive misrepresentations and omissions alleged herein, when making its decision to apply for loan assistance through the PPP.

77.     Plaintiff Above & Beyond was unaware that Defendants were disseminating misleading and deceptive misrepresentations and omissions regarding its administration and handling of the loan assistance through the PPP.

## DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS VIOLATED NEW YORK AND FLORIDA STATE LAWS

78.     Defendants violated New York and Florida state laws by engaging in fraudulent, unfair, and unlawful business practices.

79.     Defendants wrongfully and unfairly chose to put their financial interests before Plaintiffs and the Class Members despite agreeing to comply with all rules, regulations and requirements issued concerning PPP loans.

80.     Furthermore, the statements provided by and/or made by Defendants to Plaintiffs and the Class Members did not disclose Defendants' practice or policy that larger businesses' PPP loan applications should take priority.

## PLAINTIFFS' RELIANCE WAS
## REASONABLE AND FORESEEN BY DEFENDANTS

81.     Defendants knew the vital importance of the PPP loans to Plaintiffs and the Class members. Defendants also knew these small businesses needed the loans in order to ensure their viability going forward.

82.     When deciding to submit a PPP loan application, Plaintiffs reasonably relied on Defendants' material misrepresentations and omissions.

83.     A reasonable consumer would consider if a lender was not going to follow the "first come, first serve" requirement when deciding what bank to submit a PPP loan application through.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs bring this action individually and on behalf of the following class (the "Class") pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All eligible persons or entities located or headquartered in the United States who applied for a loan under the PPP with Defendants and whose applications were not processed by Defendants in accordance with SBA regulations and requirements or New York law.

85.     Plaintiffs also bring this action individually and on behalf of the following subclass (the "Florida Subclass") pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All eligible persons or entities located or headquartered in the State of Florida who applied for a loan under the PPP with Defendants and whose applications were not processed by Defendants in accordance with SBA regulations and requirements or Florida law.

86.     Plaintiffs also bring this action individually and on behalf of the following subclass (the "Backdated Subclass") pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All eligible persons or entities located or headquartered in the United States who applied for a loan under the PPP with Defendants and who received loan funding from Defendants but whose funding was backdated and did not reflect the actual date funds were provided.

87.     Plaintiffs also bring this action individually and on behalf of the following subclass (the "Backdated Florida Subclass") pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All eligible persons or entities located or headquartered in the State of Florida who applied for a loan under the PPP with Defendants and who received loan funding from Defendants but whose funding was backdated and did not reflect the actual date funds were provided.

88.     Excluded from the proposed Class, Florida Subclass, Backdated Subclass, and Backdated Florida Subclass  (collectively, "Classes") are Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

89.     This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

90.     The members in the proposed classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class members in a single action will provide substantial benefits to the parties and Court.

91.     Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)  Whether Defendants violated the regulations for administering, processing, and handling loans through the PPP;

(b)  Whether Defendants made false, misleading, and deceptive misrepresentations and omissions regarding their administration, processing, and handling of the applications for loans from small businesses through the PPP;

(c)  Whether Defendants failed to administer, process, and handle loans on a "first come, first served" basis as required by the PPP;

(d)  Whether Defendants administered, processed, and handled larger loans before smaller loans;

(e)  Whether Defendants violated various New York laws;

(f)    Whether Defendants violated various Florida laws;

(g)    Whether Defendants fraudulently concealed material facts from their clients;

(h)    Whether Defendants' conduct was negligent per se;

(i)    Whether Defendants breached a fiduciary duty;

(j)    Whether Plaintiffs and members of the Classes are entitled to actual, statutory, and punitive damages; and

(k)    Whether Plaintiffs and the members of the Classes are entitled to declaratory and injunctive relief.

92.    Defendants engaged in a course of common conduct that gave rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

93.    Plaintiffs' claims are typical of those of the members of the Classes because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

94.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

95.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

96.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

97.     As a result of the foregoing, class treatment is appropriate.

### CLAIMS FOR RELIEF
### COUNT I
**Violation of the New York General Business Law, §349,**
**Against Defendants on Behalf of the Class and Backdated Subclass**

98.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

99.     Plaintiffs and the Class are "persons" within the meaning of N.Y. Gen. Bus. §349(h).

100.    Each Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of N.Y. Gen. Bus §349(b).

101.    Under the New York Deceptive Act and Practices Statute, "[d]eceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service" are unlawful.  N.Y. Gen. Bus. §349.

102.    Defendants engaged in deceptive acts and practices in the conduct of business, trade, and commerce by prioritizing larger business loans; not processing loan applications on a first come, first served basis, as required by the SBA; and by backdating the deposited funds and using the backdate to determine the deadline by which the funds needed to be used.  Defendants' claims and misrepresentations about their compliance with applicable laws and regulations, including SBA rules and requirements, are untrue or misleading, as they failed to disclose that larger business loans were prioritized over small loans.

103.    Defendants had exclusive knowledge of how they were going to administer, process, and handle the PPP loan applications and failed to disclose these facts despite having a duty to disclose this material information to Plaintiffs and the Class members.

104.    Plaintiffs and the Class members were unaware and did not have reasonable means of discovering the material facts that Defendants misrepresented and failed to disclose.

105.    Defendants' failure to disclose such material facts concerning how the PPP loans were going to be administered, processed, and handled was misleading in a material respect because a consumer acting reasonably under the circumstances would have been misled by Defendants' conduct.

106.    Defendants' failure to disclose such material facts and their deceptive conduct induced Plaintiffs and the Class members to submit PPP loan applications to Defendants.

107.    These acts and practices were consumer-oriented because they had a broad impact on consumers at large, affecting all of Defendants' customers whose loan applications were not granted, including customers in the State of New York.

108.    As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Plaintiffs and the Class members were injured because they submitted applications for loans through the PPP with Defendants and because they could only apply for such loans once, and were prevented from seeking assistance from another lender.

109.    Defendants' acts and practices were willful and knowing.

110.    Plaintiffs and the Class members are entitled to injunctive relief, recovery of actual damages or fifty dollars per violation, whichever is greater; treble damages up to one thousand dollars; and their reasonable costs and attorneys' fees.  See N.Y. Gen. Bus. §349(h).

**COUNT II**
**Violation of the New York General Business Law, §350,**

**Against Defendants on Behalf of the Class and Backdated Subclass**

111.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

112.    New York's False Advertising Law prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."

113.    As set forth herein, Defendants' misrepresentations and omissions that they were working tirelessly to administer, process, and handle loan applications through the PPP in order to provide assistance to as many clients as possible and that they were otherwise following the requirements of the PPP were literally false, misleading, and likely to deceive the public.

114.    Defendants made these material, untrue, and misleading statements and misrepresentations in their advertising, marketing, and soliciting of the PPP loans to Plaintiffs and the Class members.  Defendants made these untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

115.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at-large, including their customers who applied for loans through the PPP in the State of New York.

116.    Plaintiffs and the Class members were induced to submit PPP loan applications with Defendants because of Defendants' advertising, marketing, and soliciting.  They were injured because they relied upon Defendants' advertising, marketing, and soliciting and were injured because they submitted applications for loans through the PPP with Defendants and because they could only apply for such loans once, and were prevented from seeking assistance from another lender.

117.    As a result of Defendants' unlawful deceptive acts and practices, Plaintiffs and the Class members are entitled to monetary, compensatory, treble and punitive damages; injunctive

relief, restitution, and disgorgement of all monies obtained by means of Defendants' unlawful conduct; and interest, attorneys' fees, and costs.

**COUNT III**
**Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *Et Seq*., Against Defendants on Behalf of the Florida Subclass and Backdated Florida Subclass**

118.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

119.    This is an action for relief under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§501.201-501.213.

120.    The purpose of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

121.    Plaintiffs and each proposed member of the Subclass are "consumers." Fla. Stat. §501.203(7).

122.    Florida Statute §501.203(8) defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." Fla. Stat. §501.203(8).

123.    The advertising, soliciting, providing, or offering of the PPP funds by Defendants to Plaintiffs and the members of the Subclass is "trade or commerce" within the meaning of §501.203(8) of the Florida Statutes.

124.     Florida Statute §501.204(1) provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

125.     In violation of the FDUTPA, the Defendants engaged in unfair, unconscionable, or fraudulent business practices by prioritizing the processing of larger loans over smaller ones, by backdating the deposited PPP funds and using the backdate to determine the deadline by which the funds needed to be used, and by asserting misleading and deceptive misrepresentations and omissions regarding their administration and handling of PPP loan applications.  Defendants should have disclosed such information because they were in a superior position to know the facts regarding the true nature of how they were administering, processing, and handling the PPP loans. Plaintiffs and the members of the Subclass could not reasonably be expected to learn or discover such information before submitting their PPP loan applications.

126.     Additionally, as set forth herein, Defendants' misrepresentations and omissions that they were working tirelessly to administer, process, and handle loan applications through the PPP in order to provide assistance to as many clients as possible and that they were otherwise following the requirements of the PPP were literally false, misleading, and likely to deceive the public.

127.     Plaintiffs and the members of the Subclass seek actual damages, in the amount of money in their respective PPP loan applications, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

### COUNT IV
### Fraudulent Concealment Against Defendants on Behalf of the Classes

128.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

129.     Defendants fraudulently concealed material facts they had a legal duty to disclose to Plaintiffs and the Class members regarding their administration, processing, and handling of the loans through the PPP.  These material facts known by Defendants were:

(a)  The order of how applications for loans through the PPP would actually be processed and granted;

(b)  That the processing and granting of larger loans would be given priority over smaller loans or loans where there was greater exposure to the bank over loans where there was less exposure; and

(c)  The applications for loans through the PPP would not be processed or granted in accordance with the PPP.

130.     Defendants intentionally and knowingly omitted this information to induce Plaintiffs and the Class members to submit applications for loans through the PPP with them.

131.     Defendants knew the concealment or nondisclosure of these facts regarding the true nature of how the PPP loan applications were going to be administered, processed, and handled were material to their clients because they contradicted the representations made by Defendants in their statements and marketing.

132.     Defendants had a legal duty to disclose this information because Defendants knew the representations made in their statements and marketing created a false impression unless these omitted material facts were disclosed to Plaintiffs and the Class members, especially as the SBA was stating loans would be processed by banks on a first-come, first-serve bases.

133.     Plaintiffs and the Class members had no knowledge of the true nature of how the PPP loan applications were going to be administered, processed, and handled based on Defendants' fraudulent concealment and nondisclosures, and they had no ability to discover the omitted

information prior to submitting their loan applications.  Given the deceptive manner in which Defendants chose to omit or not disclose material information concerning the true nature of how they were administering, processing, and handling PPP loan applications, Plaintiffs and the Class members were injured.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members suffered actual damages in that they submitted applications for loans through the PPP with Defendants and because they could only apply for such loans once, and were prevented from seeking assistance from another lender.

135.    Plaintiffs and the Class members seek injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

**COUNT V**
**Breach of Fiduciary Duty Against Defendants on Behalf of the Classes**

136.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

137.    The Defendants owed and owe Plaintiffs and the Class members fiduciary obligations as there was no arms-length transaction. Defendants failed to provide Plaintiffs and the Class with sufficient information that would disclose Defendants practice or policy to not follow the SBA regulations and requirements for PPP loans.

138.    By reason of their fiduciary relationships, the Defendants owed and owe Plaintiffs and the Class members the highest obligation of good faith, fair dealing, loyalty, and due care.

139.    The Defendants violated and breached their fiduciary duties to Plaintiffs and the Class members.

140.    Defendants' made false, misleading, and deceptive misrepresentations and omissions regarding their administration, processing, and handling of the applications for loans from small businesses through the PPP.

141.    Additionally, Defendants unjustly profited from the administration, processing, and handling of loans through the PPP as they received origination fees based on the loan amounts. Consequently, as alleged herein, Defendants prioritized larger loans- and thus larger fees- over smaller loans.

142.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Plaintiffs and the Class members have sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, Defendants are liable to Plaintiffs and the Class members.

143.    Plaintiffs and the Class members seek declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

**COUNT VI**
**Negligence Against Defendants on Behalf of the Classes**

144.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

145.    Defendants' conduct is negligence per se.

146.    As set forth above and below, Defendants violated their statutory duties under numerous statutes, including the violations of New York and Florida law alleged herein.

147.    Additionally, Defendants breached duties set forth in SBA regulations, including ethical requirements set forth in 13 CFR Part 120.140: (a) "[no] real or apparent conflict of interest with a small business with which  [they are] dealing;…(f) "engag[ing] in conduct reflecting a lack of business integrity or honesty;…(j)(1) [not disclosing] that a loan will reduce the exposure of a

[bank]; or (l) engag[ing] in any activity which taints  [their] objective judgment in evaluating the loan."

148.    Defendants' violations of such statutes and regulations is negligence per se and was a substantial factor in the harm suffered by Plaintiffs and the Class members, including their submission of applications for loans through the PPP with Defendants who violated the "first come, first served" basis for processing loan applications, as dictated by the PPP, when they processed larger loans ahead of smaller loans.

149.    As set forth above, such laws were intended to ensure that a company's claims about its services are truthful and accurate and that they engaged in business in an ethically and honest manner.

150.    By virtue of Defendants' negligence, Plaintiffs and the Class members have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of all others similarly situated, respectively requests relief against Defendants as set forth below:

A.      An order certifying one or more classes as defined above, appointing Plaintiffs and their counsel to represent the Class;

B.      An order requiring Defendants to bear the costs of class notice;

C.      An order enjoining Defendants from administering, processing, or handling loans through the PPP inconsistent with or in violation of the PPP;

D.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as alleged herein, and injunctive relief to remedy Defendants' past conduct;

E.      An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

F.      An order requiring Defendants to pay punitive damages on any count so allowable;

G.      An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

H.      An order requiring Defendants to pay punitive damages on any count so allowable;

I.      An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiffs and the Class members; and

J.      An order providing for all other such equitable relief as may be just and proper.


Dated: May 19, 2020                    GREG COLEMAN LAW PC

                                       By: s/ Alex R. Straus
                                       Alex R. Straus (NY Bar No. 5175419)
                                       16748 McCormick Street
                                       Los Angeles, CA 91436
                                       Telephone: (917) 471-1894
                                       E-mail: alex@gregcolemanlaw.com

                                       LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                       Robert K. Shelquist
                                       Rebecca A. Peterson
                                       100 Washington Avenue South, Suite 2200
                                       Minneapolis, MN 55401
                                       Telephone: (612) 339-6900
                                       Facsimile: (612) 339-0981
                                       E-mail: rkshelquist@locklaw.com
                                               rapeterson@locklaw.com

Benjamin Galdston
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Telephone: (619) 489-0300
E-mail: bgaldston@bm.net

Gregory F. Coleman
GREG COLEMAN LAW PC
William A. Ladnier
Arthur Stock
First Tennessee Plaza
800 South Gay Street, Suite 100
Knoxville, TN 37929
Telephone: (865) 247-0080
E-mail: greg@gregcolemanlaw.com
         Will@gregcolemanlaw.com
         Arthur@gregcolemanlaw.com

Daniel K. Bryson
Scott C. Harris
Patrick M. Wallace
WHITFIELD BRYSON LLP
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
E-mail: dan@whitfieldbryson.com
         scott@whitfieldbryson.com
         pat@whitfieldbryson.com

**Attorneys for Plaintiffs**